UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

MOISES CANDELARIA-SILVA,

    Defendant.

Crim. No. 95-029-16 (JAF)

**OPINION AND ORDER**

Defendant, Moisés Calendaria-Silva, moves for a reduction of his sentence pursuant to the amended sentencing guidelines for cocaine base ("crack"). (Docket No. 3194.) We denied this motion, stating that the quantity of the other narcotics distributed in this conspiracy was enough to justify Defendant's original base offense level. (Docket No. 3315.) The First Circuit vacated our order and remanded for further consideration. United States v. Candelaria-Silva, No. 08-2131, 2009 WL 4936410 (1st Cir. Dec. 23, 2009). For the reasons stated below, we again deny Defendant's motion.

In November 2007, the U.S. Sentencing Commission (U.S.S.C.) sought to lessen the disparity between the treatment of cocaine powder and crack offenses by dropping the base offense level for possession of crack by two levels for any amount less than 4.5 kg. See U.S. Sentencing Guidelines Manual supp. app. C, amends. 706, 707, 715 (2009).

Congress has provided that, where the U.S.S.C. lowers a sentencing range pursuant to 28 U.S.C. § 994(o), a defendant previously sentenced to imprisonment under that range may move the court for a reduction in his term of imprisonment. 18 U.S.C. § 3582(c)(2). **This reduction is not as of right** and may be granted only after the court considers both the policy statements of the U.S.S.C. and the sentencing factors of 18 U.S.C. § 3553(a). Id. The U.S.S.C. policy statement on sentencing reductions states that a reduction cannot be granted if applying the amended guideline would not have the effect of lowering the defendant's guideline range. U.S. Sentencing Guidelines Manual § 1B1.10(a)(2)(B) (2009). The commentary to the Guidelines Manual also counsels that public safety and post-sentencing conduct should be considered. Id. § 1B1.10 cmt. n.1(B). The following sentencing factors are among those outlined in 18 U.S.C. § 3553(a):

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a).

We deem it convenient to outline the procedures devised nationwide by courts to deal with the multitude of retroactive crack sentence reductions that the amendments to the

Crim. No. 95-029-16 (JAF)                                                                                          -3-

Guidelines generated—the majority of which were expected to have little or no merit. The undersigned, as a member of the U.S. Judicial Conference Committee on Criminal Law and in a joint effort with the U.S.S.C., issued an Administrative Directive on February 15, 2008, detailing the streamlined procedure to be followed in determining the applicability and extent of a reduction. See In re: Petitions for Retroactive Appl. of the Nov. 1, 2007 Amend. to the Crack Cocaine Offense Level Guidelines, No. 08-31 (D.P.R. Feb. 15, 2008), attached as App. 1. In the interest of expedience, the Directive also stated that the disposition of sentencing reductions would be entered on AO Form 247, a simple fill-in-the-blanks Order Regarding Motion for Sentence Reduction, as prepared by the Judicial Conference Committee on Criminal Law. Id.; see also Memorandum from the Hon. Julie E. Carnes, Chair of the Judicial Conference Comm. on Criminal Law (Feb. 20, 2008), available at http://www.ussc.gov/training/DIR8-025.pdf.

## I.

### Factual and Procedural Summary

Defendant was convicted on December 13, 1995, for conspiracy to possess with intent to distribute fifty grams ("g") or more of crack, five kilograms ("kg") or more of cocaine, one kg or more of heroin, and an undetermined quantity of marijuana. He was also convicted of possession with intent to distribute fifty g or more of cocaine. Criminal Case 95-029 is one of the largest, bloodiest drug-trafficking cases to have been prosecuted in decades. At sentencing (Docket No. 1226), we did not make any particular findings as to drug quantities for which

Crim. No. 95-029-16 (JAF)                                                                                              -4-

Defendant was responsible simply because the then-status of the law granted discretion to the trial judge to fix, by preponderance of the evidence, the drug type and quantity for a particular defendant on the basis of the trial record. On the basis of the quantities enumerated in the charges for which Defendant was convicted and our own assessment of the evidence, we conservatively calculated his base offense level at thirty-eight. (Id.) After considering the immense size of this drug-trafficking conspiracy, comprising so many members and various kinds of drugs distributed throughout the northern half of the island for many years, it was not difficult for the experienced eye of the trial judge to arrive at a level thirty-eight. We applied a four-level enhancement due to his use of a firearm and role as a supervisor, with a resulting total offense level of forty-two. (Id.)

Witness testimony at trial revealed that Defendant; his older brother, Eulalio "Macho Gatillo" Candelaria-Silva; his younger brother, Luis "Candy" Candelaria-Silva; and his mother, Alicia Silva-Maysonet, operated a drug distribution point at the Villa Evangelina housing project in Manatí, Puerto Rico. The family sold both cocaine and heroin in Villa Evangelina; they also cut and packaged cocaine to be sold at another housing project in Manatí known as Los Murales. (See Trial Tr. vol. 15, 60–86, 125–30, Docket Nos. 718; 737.) Eulalio was initially the boss of this operation, but after Eulalio's arrest and imprisonment in 1993, Defendant took control. (Id.) The Candelaria-Silvas acted as part of a larger drug-distribution conspiracy headed by Israel Santiago-Lugo, who operated drug points throughout Northern Puerto Rico. (Id.) Santiago-Lugo operated a central distribution point from his base of

Crim. No. 95-029-16 (JAF)                                                                                                   -5-

operations in the Virgilio Dávila housing project in Bayamón, Puerto Rico, from where he supplied his various satellites, including the drug points controlled by the Candelaria-Silvas, with narcotics. Over a seven-year period, this conspiracy encompassed millions of dollars in sales, which represented myriad kilograms of narcotics, from at least six distribution points. The conspirators, armed with various firearms, including AK-47 and AR-15 assault rifles, engaged in a bloody turf war with the rival Rosario brothers gang that resulted in horrific murders not seen in even the most lurid Hollywood gangster movie. Defendant personally led an armed posse on a manhunt for a group of individuals who had briefly kidnapped him and robbed him of cocaine and heroin. (See Trial Tr. vol. 15, 125–30, Docket No. 737.)

During the investigation into this conspiracy, police seized two ledgers from a coconspirator during a search of an apartment in the Virgilio Dávila project. FBI Agent Harold Clouse, an expert in the cryptanalysis of drug and racketeering records, testified that these two ledgers spanned a one-year period from October 1990 through October 1991, and detailed the supply of narcotics to members of the conspiracy. (See Trial Tr. vol. 7, Docket No. 683.) He further testified that the ledger recorded transactions for units of narcotics coded as "c," "r," and "a." (Id.) His conservative estimate of the number of units sold for each narcotic in that one-year period were as follows: 28,208 units of "c"; 7,802 of "r"; and 753 units of "a." (Id. at 981.) There were an additional 9,535 unidentified units sold. (Id.) He estimated the monetary value of all units sold as $3,472,350. (Id.)

Crim. No. 95-029-16 (JAF) -6-

Earlier in the trial, the Government called as a witness Marcos Hidalgo-Meléndez, a former member of the Santiago-Lugo organization who had been in charge of cocaine distribution in Los Murales. He testified to the use of ledgers—the same analyzed by Agent Clouse—to record the distribution of narcotics. (Tr. Tr. vol. 3, 360–65, Docket No. 662.) He further testified that "c" was short for cristal, the organization's moniker for heroin, and that "r" signified "bolso rojo," or cocaine. (Id.) According to Hidalgo-Meléndez, the units recorded in these ledgers corresponded to "packages" or "packets." (Id. at 362.) Fifty packets of cocaine equaled 1/8 kg of cocaine. (Id. at 376.) Hidalgo-Meléndez also testified that 100 packets of heroin, further divided into 1,000 bags, were sold each week at Los Murales and affirmed that this amounted to 1/8 kg per week. (Id. at 379–80 ("Q: Did you nevertheless find out how much [Santiago-Lugo] would pay for that eighth of a kilogram that you previously stated was sold every week at the Los Murales housing project? A: I was aware, I had knowledge that at that point in time the eighth of a kilo of heroin was being sold in the market for $28,000."[1]).)

---

[1] We note an apparent price discrepancy in Hidalgo-Meléndez's testimony that Santiago-Lugo purchased 1/8 kg of heroin for $28,000. Hidalgo-Meléndez had previously testified that each packet was sold for $75. At 100 packets per 1/8 kg of heroin, this would translate to a price of $7,500 per 1/8 kg of heroin. It is improbable that Santiago-Lugo was selling heroin at a loss of $20,500 per 1/8 kg. Rather, it is reasonable to infer that Hidalgo-Meléndez confused the question and answered "$28,000" as the price paid by Santiago-Lugo for a full kg of heroin. Given the $75 price per packet, and 800 packets comprising a kg, this would result in a gross of $60,000, and a net profit of $32,000 to the organization for each kg of heroin sold. This also comports with the $11 per bag street price of heroin as testified to by Hidalgo-Meléndez. (See Trial Tr. vol. 3, 380, Docket No. 662.) At that price, coconspirators would buy 1/8 kg of heroin from Santiago-Lugo for $7,500, sell it for $11,000, and split the proceeds between themselves and the runners, sellers, and lookouts that made up the lower rungs of the organization.

By applying Agent Clouse's estimates of the number of units sold to Hidalgo-Meléndez's testimony of the number of units in each 1/8 kg of cocaine and heroin, we can arrive at a total of 35.26 kg of heroin and 19.5 kg of cocaine distributed by the conspiracy in but one year of a seven-year conspiracy.

Finally, from the testimony of Carlos Otero-Colón we infer that Defendant entered into this conspiracy at some point before the period of time documented in the aforementioned ledgers. Otero-Colón testified that he transported cocaine for Santiago-Lugo's brother, Raúl, and would deliver it to Defendant to be processed before it was sold at Los Murales. (See Trial Tr. vol. 15, 60–86, Docket No. 718.) He also testified that he later tried to establish his own drug point in Alto de Cuba and that his transactions in relation to that drug point were recorded in the same ledger discussed above. (See Trial Tr. vol. 15, 87–98, Docket No. 737.) Thus, we infer that Defendant began his participation in the conspiracy at some earlier time.

## II.

### Analysis

Defendant argues that his sentence was based on the former guideline for crack and, therefore, should be reduced. We previously denied Defendant's motion, reasoning that "Any of the other narcotics standing alone substantiate the offense level 42 for which defendant was sentenced." (Docket No. 3323.) Following our denial, the First Circuit surprisingly remanded the case and instructed us to point to record support for our conclusion that Defendant had been

Crim. No. 95-029-16 (JAF) -8-

responsible for a combined quantity of narcotics great enough to justify his sentence despite the Guidelines' reduction for crack.

The First Circuit has not directly addressed the question of whether a fact-finding as to drug quantity can be made in the course of a § 3582(c)(2) proceeding. The Seventh Circuit, however, has approved of fact-finding in a sentence reduction. In United States v. Woods, the Seventh Circuit upheld a denial of a § 3582(c)(2) reduction based on drug quantities contained in the presentencing report ("PSR") but not specifically included in the findings of fact made at sentencing. 581 F.3d 531, 538–39 (7th Cir. 2009). The court found that when deciding a § 3582(c)(2) motion, district courts may not make factual findings inconsistent with the original sentencing court's findings. Id. at 538. In that case, the sentencing court found the defendant guilty of distributing "in excess of 1.5 kilograms of crack." Id. The PSR, however, stated that the conspiracy for which defendant was convicted had been responsible for the distribution of hundreds of kg of crack and cocaine powder. The Seventh Circuit noted that if the sentencing court's language had been more restrictive, e.g., if it found the defendant guilty of distributing exactly 1.5 kg of crack, then the fact-finding conducted in the § 3582(c)(2) decision might have been impermissible. The Sixth Circuit has also stated that such fact-finding in consideration of a § 3582(c)(2) motion is permissible:

> We do not agree with [defendant] that the district court's previous determination of 'more than 1.5 kilograms' means that it cannot also find more than 4.5 kilograms . . . . [N]othing in the record from [defendant's] initial sentencing indicates that the district judge made any specific determination other than more than 1.5

>     kilograms . . . . [A] new factual finding of the higher quantity is not
>     inconsistent with the court's determination at [defendant's] original
>     sentencing.

United States v. Moore, 582 F.3d 641, 646 (6th Cir. 2009).

The Fourth Circuit, in an unpublished opinion, joined the Sixth and Seventh Circuits in stating that new fact-findings of drug amounts may be made, so long as they are not inconsistent with fact-findings made during the original sentencing. See United States v. Jones, No. 09-7785, 2010 U.S. App. LEXIS 14875 (4th Cir. July 20, 2010).

For the reasons previously explained, and because it was obvious to all involved that the immense quantities of drugs distributed over this seven-year conspiracy justified a base offense level of thirty-eight, we made no further findings of specific drug quantities at sentencing. (See Docket No. 1226.) We also note that the charges Defendant was convicted of did not enumerate definite amounts. (See Docket No. 322 at 4 (charging "(5) kilograms or more . . . of . . . cocaine" and "(1) kilogram or more . . . of heroin") (emphasis added).) From the trial testimony of Hidalgo-Meléndez and Agent Clouse, we easily and conservatively infer that in a one-year period this conspiracy was responsible for the possession with intent to distribute at least 35.26 kg of heroin. This amount of heroin, alone, results in a base offense level calculation of thirty-eight. Furthermore, this number accounts for distribution of heroin in only one year of a seven-year conspiracy—a period in the relative infancy of Santiago-Lugo's criminal organization. In succeeding years, this drug distribution operation expanded to even more drug points. In our view, the 35.26 kg of heroin and 19.5 kg of cocaine we attribute to the conspiracy is merely the

Crim. No. 95-029-16 (JAF)                                                                                              -10-

tip of the iceberg.  Furthermore, from the testimony of Carlos Otero-Colón discussed supra, we find that Defendant had entered into the conspiracy by this point and that the amount of narcotics distributed was reasonably foreseeable to him.  This fact-finding is consistent with the charges Defendant was convicted of and is made on the basis of the factual record developed at trial.  We agree with the Fourth, Sixth, and Seventh Circuits that a fact-finding of this nature is proper.

Because Defendant participated in a conspiracy to possess with intent to distribute a quantity of heroin that justified his original base offense level, regardless of the amount of crack attributable to the conspiracy, Defendant does not qualify for reduction under § 1B1.10.  A consideration of § 3553(a) sentencing factors is, therefore, unnecessary in this case.

**III.**

**Conclusion**

For the foregoing reasons, we hereby **DENY** Defendant's motion for sentence reduction under § 3582(c)(2) (Docket No. 3194).

**IT IS SO ORDERED.**

San Juan, Puerto Rico, this 9th day of November, 2010.

                                                                 s/José Antonio Fusté
                                                                 JOSE ANTONIO FUSTE
                                                                 Chief U.S. District Judge